IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | |
| RONALD LITTLE | : | NO. 06-644 |

MEMORANDUM AND ORDER

McLaughlin, J.                                              June 26, 2007

      The defendant is charged with crimes related to credit card fraud. He moves to suppress certain statements he allegedly made to his probation officer and to Secret Service agents. The Court held a hearing on June 4, 2007, and will deny the motion.

I.   Findings of Fact

      Special Agent Kelly Fincher works for the United States Secret Service in Philadelphia. She is a Special Agent in the Financial Crimes Division. In December of 2005, she was investigating the use of counterfeit credit cards and sent a posting with photographs of the defendant through the International Association of Financial Crimes Institute to see if anyone could identify him. Probation Officer Bergmann received the email on December 29, 2005. He contacted Fincher and told her that the individual was Ronald Little, a supervised releasee under his supervision. Bergmann gave the agent Little's identifiers: Social Security number, date of birth, etc. He

ENTERED
JUN 26 2007
CLERK OF COURT

probably also gave her Little's address. When something goes through IAFCI, it goes through a mass email to all banks, law enforcement, and any financial institutions on the router. Bergmann did not get the email directly from IAFCI. He could not recall who sent it to him.

There were two or three telephone calls between Bergmann and Agent Fincher. Fincher called Bergmann back to verify that he believed the man in the photograph was Ronald Little. They also discussed Bergmann conducting a home visit of the defendant. Bergmann scheduled a home visit for January 5, 2006. Before the home visit, the agent showed him some devices that are used for copying credit cards: a foil machine and a boiler machine. It was Bergmann's intention to see if any of these machines were in Little's house. Bergmann and Fincher also discussed Bergmann's looking in Little's home for the shirt Little was wearing in the photograph. Fincher conceded at the hearing on this motion that it would have been helpful information to know that the shirt that was in the photograph was also in Little's home.

Bergmann scheduled the home visit in part because of the email he got from Fincher, but there were also other reasons for him to go to the house. He had reason to believe through the pictures and information from Fincher that Little may have been in violation of supervised release. Bergmann was building

2

evidence to show that it was more likely than not that Little was involved in something criminal. Bergmann did not view himself as assisting Special Agent Fincher. He was doing his own independent investigation.

When Bergmann arrived for the home visit, Little was just getting out of the shower. His mother came up to his room and told him that his probation officer was there. Little went downstairs and greeted Bergmann at the door. Bergmann told Little that he wanted to look in his room. Little said, "Come on up." Bergmann went upstairs and went into the defendant's room. He asked Little to open up a closet in the room. Little did so and Bergmann looked through it. Bergmann then asked Little to open the drawers in the dresser. Little opened up the drawers and Bergmann asked him to move things around. Bergmann went through all the drawers. He saw a shirt that matched the shirt in the email that he had from Fincher. He did not see any credit card-copying devices. During the home visit, Fincher was in an unmarked car near the residence. The Secret Service wanted to get a visual of what Little looked like physically. Bergmann told Little to go outside with him. Little did so.

After the home visit, Bergmann advised Fincher that he found the shirt. He told her on February 1 that they were going to violate Little.

3

Fincher told Bergmann that she wanted to interview Little, and he told her that the defendant was coming in to Probation for his next regularly-scheduled appointment on February 10, 2006. She went to Probation with Special Agent Charles Holliday on that date. Agents Fincher and Holliday arrived before Little's scheduled meeting and waited in Bergmann's office. When Little arrived at Probation, Bergmann went out to meet him and to conduct the standard security wand procedure. When Little came back into his office, Bergmann introduced Little to both agents. Bergmann said that the agents wanted to ask him some questions. Little said okay. Bergmann then pulled up on the computer screen the color photograph that had been emailed to him. Bergmann asked Little if he was the person in the photograph and Little said yes.

Bergmann then advised Little that he did not have to go with the agents to answer any questions. It was totally up to him. Fincher and Holliday were walking out of the room when Bergmann was explaining this to Little. They said: "Do you mind coming upstairs with us to answer some questions" and he said "no problem" and went up with agents to their offices on the seventh floor of the same bulding.

Little rode up with the agents on the elevator to their offices. He was not handcuffed, and was never told that he was under arrest. The agents put him in an interview room. Little,

Holliday and Fincher were in the room. Twenty to thirty minutes into the interview, Holliday had to leave and Special Agent Eric Wolfson came in. The agents did not have their guns in the room. They had put their guns in a locked box. Guns were never displayed to Little.

Bergmann was in a room directly next door. He could see the interview and hear the interview through a one-way window. Little did not know that Bergmann was listening to the interview. Bergmann had prearranged with Agent Fincher to listen to the interview and told Fincher that it was a requirement that he listen.

When Little and the agents arrived at the interview room, the first thing Agent Fincher did was to read Little his *Miranda* rights and have him sign the form indicating that he understood those rights and was waiving them. As she read Little his rights, she turned the *Miranda* form towards him and pointed with her pen as she read the text. She then asked the two questions at the bottom and had him sign it. Little signed the waiver and did not express any concerns about it.

After the waiver was signed, Fincher showed Little the same picture that Bergmann did. Little then told her what he had been doing at the store where the photograph had been taken. Fincher asked him open ended questions to see what information he could provide before telling him what information the agents had.

5

During the interview, Agent Fincher told Little that they were not interested in pursuing him. They were more interested in "bigger fish," including someone referred to as "Chink." She told him that it would be helpful to him if he could give the agents the real name of "Chink" rather than a nickname. She told him that the more information he could provide, the better it would be for him. She told him that she was more interested in arresting others rather than him. She does not recall saying that he might not be arrested. She said that she would not have told anyone that they were not going to be arrested.

At some point during the interview, she asked him to do a written statement. At the top of the statement, Little was again advised of his Miranda rights. After he wrote the statement, Fincher read it aloud to him to make sure that she could understand what it said and that everything he wrote was accurate. A portion of Little's statement did not make any sense, and Fincher asked him what he meant. He told her and she changed a word. This word change is in Fincher's handwriting. The initials on the change are Little's. He wrote the statement at the end of the interview.

At the end of the interview, the agents said that Little was free to go. It was agreed that he was going to try to get some names and contact information for the agents. Agent

6

Fincher gave him her phone number to contact her if he remembered anything else. The whole interview was about two hours. Little then went back down to Probation because Bergmann still had to talk to him in connection with his visit there.

The officers were cordial during the interview. They offered the defendant water. They told the defendant that if he wanted to go to the restroom, there was one nearby. Little did not use the bathroom. He never asked for anything during the interview. He was never handcuffed. He was never frisked. Fincher never used a hostile tone with him. Little never asked for an attorney. Little never asked if the agents thought he should talk to an attorney. Little never asked to stop the questioning. The agents never told him that he was under arrest or that he was free to go. He never asked to leave during the interview.[1]

II. Analysis

The defendant moves to suppress all statements made to the probation officer and the Secret Service agents on the ground

---

[1] The defendant's version of the interview was different from the Court's findings of fact. The Court found the agents' and probation officer's testimony about the interview more credible. The defendant's version was inconsistent with the documents and the defendant was impeached with a variety of convictions for crimes of deception or dishonesty.

7

that the statements were taken in violation of his Fifth Amendment rights.

The Court concludes that Little's statements initially made to his probation officer, before he was given his Miranda rights, were not taken in violation of his Fifth Amendment rights because he was not in custody and could have invoked his rights. Minnesota v. Murphy, 465 U.S. 420 (1984).

In Murphy, the United States Supreme Court held that Miranda warnings were not required for probation officers' interviews with their probationers, even though such meetings may be required as a condition of probation and probationers may be under an obligation to answer questions truthfully, and even if a probation officer consciously seeks incriminating evidence during an interview. Id. at 431, 434-49. The Murphy court held that such interviews did not constitute custodial interrogations and therefore Miranda did not apply. Id. at 430-31. The Murphy court also held that a probationer's legal obligation to attend meetings with his probation officer and answer questions truthfully did not attach an impermissible penalty to the exercise of his rights and that any fear a probationer might have that his probation could be revoked if he exercised his right to remain silent would be unreasonable. Id. at 437-38. Under Murphy, probationers may still assert their Fifth Amendment rights in response to their probation officers' questions, but if

they do not do so, they are presumed to have waived those rights and their statements will be admissible.

The presence of the agents at the probation office does not alter the admissibility of Little's statement to his probation officer. The agents' presence did not transform the non-custodial probation meeting into a custodial interview. For a person to be taken into custody outside of the context of a formal arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." United States v. Leese, 176 F.3d 740,743 (3d Cir. 1999). Factors to be considered in determining whether someone is in custody include:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006)

Applying these factors to Little, they show he was not in custody at the time he made his statement to Probation Officer Bergmann. Little made his statement in Bergmann's office, where he had regularly scheduled meetings. He made it within minutes

of arriving at the office, right after being introduced to Agents Fincher and Holliday. No coercive tactics were used. The agents did not display guns, use hostile language or tones of voice, or restrain Mr. Little. He was asked if he would speak with the agents and voluntarily agreed to do so. Although Little was not told he was free to leave, he was not told he had to speak to the officers.[2] Considering all these facts and circumstances, Little was not in custody when he made his statement to Probation Officer Bergmann. His statement therefore was not obtained in violation of Miranda or his Fifth Amendment rights.[3]

The defendant was also not in custody when he gave statements to the Secret Service Agents, although the question is a closer one. By the time Little made his statements to the agents, he had been told he did not need to go with them or answer any questions, but he voluntarily agreed to do so.

---

[2] Although Little was later told he did not need to speak to the agents, he had not yet been told this when Bergmann asked him about the photograph.

[3] The Court's finding that Little was not in custody when questioned at his probation office accords with other decisions considering similar instances. C.f. United States v. Cranley, 350 F.3d 617, 619-20 (7th Cir. 2003) (probationer was not in custody for purposes of Miranda when he was interviewed by a federal agent at his regularly-scheduled probation meeting); United States v. Webb, 2006 WL 32545354 at *3-*4 (W.D. Pa. Nov. 9, 2006) (same); but see United States v. Ollie, 442 F.3d 1135 (8th Cir. 2006) (holding parolee was in custody when his parole officer ordered him to speak to the police). Here, unlike the parolee in Ollie, Little was never ordered to speak with the Secret Service agents and instead was expressly told he did not have to talk to them.

Although his questioning took place in the more coercive surroundings of an interview room, he was never restrained or threatened. He was never told he had to answer questions or that he couldn't leave. The entire interview lasted only two hours. Given these facts, Little was not in custody when the agents interviewed him, and his statements therefore could be taken without Miranda warnings without violating his Fifth Amendment rights.

Even if Little had been in custody during his interview with the agents, his Miranda rights would not have been violated because he voluntarily waived them. Special Agent Fincher advised the defendant of his Miranda rights, both orally and in writing, and Little voluntarily waived them before he made any statements to the agents.

The defendant has also argued that his statements should be suppressed under a "stalking-horse" theory. The Court does not see how this theory has any relevance here. A probation officer "acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers." United States v. Williams, 417 F.3d 373, 377 (3d Cir. 2005). Under the theory, such a parole search would be invalid because it is "nothing more than a ruse for a police investigation." Id. (internal quotation omitted). The United States Court of Appeals for the Third Circuit has never accepted

11

the stalking horse theory and has questioned whether it remains valid in light of United States Supreme Court rulings suggesting a Court should not inquire into the subjective purposes behind a search.  <u>Id.</u> at 378 (citing <u>United States v. Knights</u>, 534 U.S. 112, 122 (2001)).

The Court need not address whether a stalking horse theory remains available in this circuit.  Whether the probation officer was or was not a "stalking-horse" for the Secret Service agents, the defendant was not in custody when he gave the statements and he was advised properly of his rights.  The theory might have some relevance if the defendant was moving to suppress any evidence found during the home visit by the probation officer.  The government, however, does not seek to introduce any evidence from that home visit.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : CRIMINAL ACTION

v.

RONALD LITTLE : NO. 06-644

FILED
JUN 26 2007
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

ORDER

AND NOW, this 26th day of June, 2007, upon consideration of the defendant's motion to suppress (Docket No. 33), the government's response thereto, and after a hearing on June 4, 2007, IT IS HEREBY ORDERED said motion is DENIED for the reasons stated in a memorandum of today's date.

BY THE COURT:

_____
MARY A. McLAUGHLIN, J.

ENTERED
JUN 26 2007
CLERK OF COURT